UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

WILLIE C. JONES, JR.                         CIVIL ACTION NO. 11-cv-1400

VERSUS

BRAD ANDERSON                         MAGISTRATE JUDGE HORNSBY

**MEMORANDUM RULING**

**Introduction**

       Willie Carl Jones, Jr. ("Plaintiff"), a self-represented inmate, filed this civil rights action based on allegations that Bossier Parish sheriff's deputy Brad Anderson subjected him to excessive force when Plaintiff was housed at a Bossier facility. He also named as defendants the sheriff and others, but they were granted summary judgment. The parties consented to trial by the undersigned pursuant to 28 U.S.C. § 636(c), and Plaintiff waived a jury. A bench trial was held on July 8, 2014.

       The altercation that gave rise to the suit occurred during the uniform exchange in E-pod at the Bossier Parish Maximum Security Facility. Inmates in E-pod are there because they have been placed in administrative segregation, often for a rule violation, and each is locked in an individual cell. Plaintiff requested a size 3XL uniform, but Deputy Anderson directed that Plaintiff try on a size 1XL uniform. Plaintiff threw the 1XL uniform on the ground. A video recording taken from a camera directly across from Plaintiff's cell shows that Anderson then stepped inside the cell, and the two men engaged in a physical altercation.

The recording lacks audio, and it does not provide a clear view of what happened inside the cell. Thus, an assessment of the lawfulness of the force used must be made based on the testimony and other evidence submitted at trial.

**Excessive Force**

Plaintiff was a pretrial detainee, awaiting trial on two counts of murder, at the time of the incident. The Fifth Circuit applies the same excessive force standard to pretrial detainees as in the case of convicted prisoners. The question is whether the measure taken inflicted unnecessary and wanton pain and suffering. That will depend on whether the force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm. Valencia v. Wiggins, 981 F. 2d 1440, 1446 (5th Cir. 1993); Brothers v. Klevenhagen, 28 F.3d 452, 456 (5th Cir. 1994).

**Trial Evidence**

    **A. Willie C. Jones, Jr.**

Plaintiff testified that Anderson asked the trustee which inmate had received a 3X uniform. When told it was the inmate in E-107, Anderson asked Deputy Rowland by radio to open the cell door, and he told the trustee to give Plaintiff a 1X uniform. Plaintiff testified that he responded by saying there was no way he was wearing that uniform, and he threw it down. He admitted that he was positioned sideways or "bladed" to Anderson, but he said he stood in that position during the entire discussion.

Plaintiff testified that, when he refused the 1X uniform, Anderson responded by entering his cell and striking Plaintiff with his fists and his radio, eventually pinning Plaintiff

between the wall and bed. Plaintiff says it was at this point in the altercation when Anderson hit him in the eye with the radio. Anderson then used the radio to call Deputy Rowland for help, and he put the radio on the top bunk.

Plaintiff noted that Anderson did not open any of the other inmates' cell doors. Their uniforms were simply exchanged through a slot in the locked door. He thinks Anderson was looking for a reason to obtain access to Plaintiff, because of Plaintiff's notoriety as a double murder suspect, and attack him. Plaintiff also stated that he had been "authorized" to receive a 3X uniform in August and September, according to a log sheet posted above his cell.

Plaintiff admitted on cross-examination that he had been convicted of two second-degree murders, an attempted murder, and had a lengthy history of misbehavior and violence while in prisons and jails. He admitted pleading guilty to possession of contraband that was a homemade shank, and he has used homemade weapons to injure fellow inmates. Plaintiff also admitted striking guards at Angola and other facilities. He pleaded guilty to disciplinary charges for possessing homemade metal darts, and he once shot a dart that stuck above an orderly's eye. Plaintiff admitted that he was in administrative segregation because, during a move, he told a deputy, "Fuck you, you carry this shit," and threw down his belongings. Plaintiff also conceded making a remark along the lines that discipline did not mean much to him because he was facing two life sentences and, "Shut my door, or this may end badly." Plaintiff has also been involved in incidents such as pouring hot coffee on an inmate, being disciplined for possessing a razor blade, and twice spitting in the face of guards. He admitted that he was treated years ago for paranoid schizophrenia and hearing voices.

### B. Jamarcus Bryant

Jamarcus Bryant, now housed in Jackson Parish after being convicted of convicted of attempted armed robbery, testified that he was in the cell directly across from Plaintiff. His door was closed, and he was viewing matters through a small window in the door from 20 to 25 feet away. He claimed that the light was on inside Plaintiff's cell.

Bryant, whose memory of the incident was refreshed with his written statement given at the time of the investigation, admitted he could see only the front part of Plaintiff's cell, and Anderson's back blocked his view. He nonetheless testified that Plaintiff only tried to protect himself and did not try to harm Anderson. He did not see Plaintiff be aggressive toward Anderson or throw his uniform at Anderson. He recalled that Anderson entered the cell, and "tussling" began. He saw Anderson try to take Plaintiff to the ground, but he did not see Plaintiff swing at Anderson or "initiate the first lick."

### C. LaQuinton Robinson

LaQuinton Robinson, now housed in Concordia Parish after being convicted of aggravated burglary, was being held in Bossier at the time. Robinson was housed across the hall, two cells to the left of E-107. His door was closed, and he was lying down and watching through his food hatch. He recalled that the light was on in Plaintiff's cell.

He did not recall many details of the incident until his memory was refreshed with his written statement given at the time of the investigation. He recalled Plaintiff asking for a larger size uniform and Anderson asking Plaintiff to get off the floor and stop talking. (No other witness recalled such comments.) Robinson also recalled that Plaintiff said, "I ain't

wearing that motherfucker." He remembered the cell door opening, followed by tussling, and a call for backup.

More specifically, Robinson said that Anderson told Plaintiff to back up, and Plaintiff did. Anderson then started swinging, and Plaintiff got under a bench, tried to block his face, and asked, "What did I do?" Robinson admitted he could not see the two men after they were on the ground. He did not see Plaintiff swing at Anderson or be aggressive. He remembered that Anderson had a walkie-talkie, but he was fuzzy on what Anderson did with it; he thought Anderson may have dropped it. Robinson did not recall hearing Plaintiff make remarks about being treated like a child or defending himself if guards came in his cell.

### D. Brad Anderson

Deputy Brad Anderson testified that he was a sergeant and shift supervisor for the evening shift, meaning he was the senior deputy. At the time of this incident, he had about seven years experience working in corrections. Uniform exchange was conducted two or three times per week. Anderson's evening shift had just taken over uniform exchange the week before. The procedure was for a deputy to accompany a trustee who handed out uniforms to ensure that contraband was not passed and that inmates received the proper size uniform. There were concerns that large uniforms could be used to conceal weapons or other contraband, and it avoided inmates' pants falling down in a facility that included female staff. Deputies had recently received word to make sure inmates received the proper size uniform.

Anderson said he, as supervisor, ordinarily would not have accompanied the trustee on the uniform exchange, but the shift was shorthanded that evening, so he did. As each

inmate put on his new uniform, Anderson watched through the small window in the cell door to ensure there was a proper fit. Video shows that the trustee with the uniforms arrived at Plaintiff's cell several seconds before Anderson, who said his delay was because he was observing the other inmates for proper fit.

Anderson said that he asked the trustee what size Plaintiff requested. When told 3X, Anderson said no; he believed that Plaintiff (about 5'11" and 225 pounds) needed a smaller uniform. Anderson radioed the key room to open the cell door. Plaintiff argues that Anderson could have avoided any confrontation by conducting the uniform exchange through the slot in the door, but Anderson said he opened the door because he thought it possible that if the 1X did not fit, there would need to be another exchange for a 2X, and the open door would be speedier than repeated one-way passes through the slot. Plaintiff, rather than try on the offered 1X, immediately threw it on the ground and, according to Anderson, said, "I'm not wearing that motherfucker."

Anderson testified that Plaintiff followed this statement by "blading" his body in a sideways stance, balling his fists, and making a small advance toward the door. Anderson testified that he wanted to keep Plaintiff contained in the cell and not allow him into the common area where there might be mops, cleaning supplies, or other items that could be used as weapons. He entered the cell and used his left hand to push Plaintiff back. Plaintiff then used his right hand to swing at Anderson, but he missed. Anderson responded by using his left hand to hit Plaintiff in the chest, then he used his right hand to strike Plaintiff in the left cheek. Anderson said he did so to stun Plaintiff and get his compliance. He then pushed

Plaintiff into a corner between the wall and bunk and grabbed Plaintiff's hands. Anderson said he released his right hand so he could pull his radio from his empty weapon holster and call for help. That allowed Plaintiff's left hand to be free, and Plaintiff used it to pull on Anderson's uniform, name tag, and v-neck of his shirt. Anderson then put his radio on the top bunk and used his right hand to regain control of Plaintiff, who he soon put on the ground.

Anderson rolled Plaintiff onto his stomach, which allowed Plaintiff to free his hands and secure them under his body. Deputy Cesar Mora soon arrived and helped regain control of Plaintiff's arms and apply handcuffs. Anderson testified that he saw a cut below Plaintiff's left eye when they sat him up, and he got gloves to allow an examination. Plaintiff said, "This ain't over yet," and he was aggressive and noncompliant even during the exam. Photographs were taken of Anderson's hands. They show minor red marks but no bruises.

A log sheet posted above the cell door indicated that Plaintiff had received a 3X uniform on a number of prior occasions. Anderson testified that he did not care what the log said, which would have been marked by deputies on the shift that formerly performed uniform exchange. Rather, he made an individual assessment of the inmate for proper fit, keeping in mind the recent emphasis on proper sizing.

Plaintiff questioned why Anderson did not use pepper spray rather than physical force. Anderson testified that he chose to push Plaintiff back into the cell rather than attempt to obtain compliance with pepper spray because merely using the spray would more easily allow Plaintiff to get outside his cell, which Anderson wished to avoid.

### E. Joseph Rowland

Joseph Rowland was a sheriff's deputy at the time. He now works for the Benton police department. He was working in the E-pod control room that evening. From that post, he could not hear the conversation inside the pod between Plaintiff and Anderson. Anderson radioed to open door to E-107. Rowland did so, and he turned on a monitor so he could watch the cell through the nearest camera. He testified that he could see Plaintiff blade his body in a defensive manner and take a step forward, but he could see little to nothing of what happened once the men went inside the cell. Rowland radioed for backup, and Deputy Cesar Mora arrived.

Rowland testified that he had experience as a military combat medic. He used gauze to clean Plaintiff's cut and assess the need for stitches. There was minor bleeding. Anderson's uniform was disheveled, and the flag insignia had been pulled from it. Rowland heard Plaintiff say something like, "This might not be over yet" and "If you step in my cell, I'll defend myself." Rowland said there was no particular policy in place regarding restraints or other preconditions to opening the door of a cell in E-pod.

### F. Cesar Mora

Deputy Cesar Mora was working in the booking office that night. He recalled that the sergeants had recently told deputies to monitor uniform exchange to ensure that there were enough large uniforms for inmates who needed them and to avoid contraband issues. Mora was called to E-pod to assist Anderson, who was on top of Plaintiff (face down) when Mora arrived. Mora handcuffed Plaintiff and saw a cut under Plaintiff's eye, which was not

bleeding profusely. Mora recalled Rowland asking Plaintiff if they were going to have any more issues with him, and Plaintiff responded, "If you don't quit treating me like a child, this will not be over." Based on that, Mora chose to leave Plaintiff handcuffed.

### G. Craig Stokes

Craig Stokes is the warden of the Bossier Maximum Security Facility. He testified that there was no written policy regarding opening cell doors in segregation units. He said it was standard to not allow two segregation inmates out for recreation at the same time. Otherwise, deputies just knew to be cautious on walk-throughs and to use common sense.

Plaintiff suggested that blood from his eyeglasses had been wiped off. Stokes said that the officers who looked into the incident placed the glasses on his desk that night and locked the door. When Stokes saw the glasses in the morning, he did not see blood on them. (A photograph taken during the investigation shows a small amount of blood).

Plaintiff attempted to establish that the lack of a disciplinary or criminal proceeding against him for battery or attacking Anderson supports his case. Stokes explained that discipline was initiated on charges of disobedience, disrespect, and jeopardizing or threatening security/staff. Plaintiff refused to plead guilty. Rather than pursue the disciplinary charges that could land Plaintiff in disciplinary segregation, Stokes elected to leave Plaintiff in administrative segregation. He knew that Plaintiff's murder trial was starting in about 10 days, and he did not want to give rise to a claim that the defense was hindered due to Petitioner's lack of access to legal materials that were prohibited in disciplinary segregation.

### H.  Craig Ammons

Sergeant Craig Ammons helped investigate the incident.  He did not recall Plaintiff stating that Anderson hit him with a radio.  He did not recall checking the radio for blood or otherwise.  Plaintiff attempted to show that a written policy regarding alcohol testing of deputies involved in death or serious injuries was violated, but Ammons pointed out that the policy applied only to cases of lethal force.  Ammons also noted that the lack of blood on the bottom of the eyeglasses could be explained by the fact that a cut does not always begin bleeding right away.

### I.  Johnny Tennyson

Johnny Tennyson, now retired, investigated the matter for internal affairs.  He said it was not possible for him to enhance or otherwise get a more clear video than what was played in court.  Plaintiff suggested perhaps the video could have been sent to the FBI or an outside source, but Tennyson said he had never done that before.

Tennyson took an audio recording device inside the cell where inmate witness Robinson had been housed to determine what Robinson might have been able to hear.  He recorded while two deputies engaged in conversation at the area of Plaintiff's cell.  Tennyson's voice can be heard on the recording, but none of the other conversation is audible.  There is no way to know, of course, at what level they were speaking and if it comparable to the levels employed in the incident.   It was also not said whether the food hatch was open during the recording or whether the recorder was held at that level, which is where Robinson said he was during the incident.

It was noted during Tennyson's testimony that the video recording shows the light in cell E-107 was not turned on until well *after* the use of force had ended and the cleanup/investigation begun. That is contrary to the testimony of the two inmate witnesses who said the cell light was on when they witnessed the altercation.

### J.  Dr. Kamran Shahid

Dr. Kamran Shahid was working in the emergency room at LSU and examined Plaintiff after the incident. A nurse who conducted triage noted that the chief complaint was a laceration, which Dr. Shahid said was 2 or 2.5 centimeters wide below the left eye. He described the wound as superficial and not bleeding. He did not recall other complaints, and there was no report that Plaintiff lost consciousness.

Dr. Shahid recalled Plaintiff saying that he received the cut from a punch during an altercation. Plaintiff's pain score was noted as zero. The wound was treated with Dermabond. Dr. Shahid said there were no other signs of bruising or other injuries from punches, and Plaintiff did not look like someone who had been actively beaten. A color photograph of Plaintiff's face, taken at the time of the incident, is consistent with that Dr. Shahid's descriptions.

Dr. Shahid said that eyeglasses on a person who was punched could have caused the cut but, for some reason, he was doubtful that a radio would have done so. Plaintiff brought to the trial the eyeglasses he wore that evening, and the court examined them. (They were not admitted into evidence because Plaintiff wanted to keep them in his possession.) The lenses were plastic. The frames were rimless on the bottom so that the edges of the lenses

could contact the skin. Running a finger over the bottom edge of the lenses revealed the edges to be fairly sharp. One could easily envision a lens edge causing a laceration or tear if the wearer were punched with a fist or otherwise had the glasses forced against his face.

**Analysis**

Plaintiff bears the burden of proving by a preponderance of the evidence, meaning that it is more likely than not, that Anderson did not apply the force in this incident in a good-faith effort to maintain or restore discipline; rather, he did so maliciously and sadistically for the very purpose of causing harm. The video recording does not substantiate or disprove the version of events offered by Plaintiff or Anderson. Thus, Plaintiff must meet his burden based on the credibility and weight of the testimony received at the trial.

The appellate decision in State v. Jones, 81 So.3d 236 (La. App. 2d Cir. 2011), writ denied, 88 So.3d 462 (La. 2012) indicates that Plaintiff, who was well known in Shreveport's Highland neighborhood for involvement in the drug and prostitution trade, was convicted of the two counts of second degree murder for which he was awaiting trial at the time of this incident. He first killed a drug customer by shooting him seven times. A few days later, when he learned police were looking for him, he killed a prostitute who could testify against him on the first murder. He shot her five times and stabbed her four times. The decision also mentions a 1995 guilty plea to attempted second degree murder in an incident arising from a failed car-jacking at Byrd High School. Plaintiff also has a horrible record of illegal conduct and defiance while incarcerated. He has spit on, struck, and injured with weapons

fellow inmates and correctional officers. He has repeatedly violated rules and engaged in defiant behavior.

Engaging in defiant and aggressive conduct when presented a uniform he believed too small is fully in keeping with Plaintiff's record of behavior. His reported statements after the incident are also consistent with that defiant personality. The court finds that Plaintiff has not met his burden because his testimony about the details of the incident are not fully credible. On the other hand, the facts testified to by Deputy Anderson were believable. Anderson admitted that he struck Plaintiff with his fists and, with either his fists or the floor, caused the cut on Plaintiff's eye. Anderson admitted the contact but said he engaged in it only because of the need to maintain discipline and keep Plaintiff inside his cell. The court finds his explanation credible and reasonable.

Plaintiff suggested that Anderson had the cell opened because Anderson simply wanted to attack Plaintiff because of his notoriety as a double murder suspect. There was, however, no factual support for that unusual contention. In the end, Plaintiff simply did not present credible evidence sufficient to satisfy his burden of proof. Accordingly, judgment for the defendant will be entered.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 17th day of July, 2014.

Mark L. Hornsby
U.S. Magistrate Judge